IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Deneise Evon King,                    )
                                       )        Civil Action No. 6:12-3043-TMC-KFM
                    Plaintiff,         )
                                       )        **REPORT OF MAGISTRATE JUDGE**
         vs.                           )
                                       )
Carolyn W. Colvin,                     )
Commissioner of Social Security,[1]    )
                                       )
                    Defendant.         )
_____)

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits ("DIB") on March 29, 2009, alleging that she became unable to work on August 28, 2008. The application was denied initially and on reconsideration by the Social Security Administration. On May 6, 2010, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Feryal Jubran, an impartial vocational expert, appeared on

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

January 24, 2011, considered the case *de novo*, and on February 25, 2011, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied review on August 20, 2012. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant will meet the insured status requirements of the Social Security Act through December 31, 2013.

(2)    The claimant has not engaged in substantial gainful activity since August 28, 2008, the alleged onset date (20 C.F.R § 404.1571 *et seq*).

(3)    The claimant has the following severe impairments: sacroiliac joint dysfunction and degenerative disc disease (20 C.F.R. § 404.1520(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the criteria of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b). Specifically, the claimant has the residual functional capacity to sit for six hours in an eight hour day, stand and walk for six hours in an eight hour day with the freedom to change positions; lift and carry up to 25 pounds occasionally, which is defined as one third of an eight-hour workday; and lift and carry up to ten pounds frequently, which

2

is defined as up to two-thirds of an eight-hour workday. The claimant must avoid running, jumping, climbing, walking on uneven surfaces, but is otherwise able to perform postural activities occasionally. The claimant is able to occasionally reach overhead, but should avoid all exposure to dangerous moving machinery and unprotected heights. The claimant is further limited to the performance of simple, routine, repetitive tasks.

(6)     The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7)     The claimant was born on December 19, 1964, and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. § 404.1563).

(8)     The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569 and 404.1569(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from August 28, 2008, through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1)  is engaged in substantial gainful activity, (2)  has a severe impairment, (3)  has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4)  has an impairment that prevents past relevant work, and (5)  has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. § 404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).  He

4

must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there

5

is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff has worked as an assistant aiding autistic and disabled individuals in healthcare and school settings (Tr. 28-30).  On August 27, 2008, she injured her back while lifting a middle school student from a wheelchair to the toilet (Tr. 232).  On August 28, 2008, the plaintiff went to Doctors Care for the injury.  Exam revealed tenderness to palpation from T8-L5 with positive muscle spasms.  The doctor noted that walking and sitting for too long made the plaintiff's pain worse.  Ibuprofen offered no relief of pain.  Diagnosis included acute low back strain for which the doctor prescribed Flexeril. The doctor issued a Return to Work Form restricting the plaintiff to lifting no more than five pounds, no repeated bending, stooping, squatting, pushing, jerking, twisting, or bouncing, no continuous standing or sitting, driving, and minimum walking (TR 233).

The plaintiff returned to Doctors Care on August 31, 2008, noting that her condition remained the same and that the medication prescribed on the last visit was not relieving her pain (Tr. 230).  Exam remained unchanged.  The doctor discontinued Flexeril, started the plaintiff on Lortab and referred her to physical therapy.  The Return to Work Form restricted the plaintiff in the same manner as the previous form (Tr. 231).

On September 4 and 8, 2008, the plaintiff returned to Doctors Care, stating that she had developed weakness with shooting pain down the posterior left leg and that she was unable to tolerate Lortab (Tr.225).  Exam revealed tenderness to palpation over the region and somewhat reduced strength on the left.  The doctor referred the plaintiff for a lumbar MRI as soon as possible.  Her Return to Work Form limitations were unchanged (Tr. 222, 226).  The Diagnostic and Referral Prescription indicated persistent lower back pain with radiation and motor deficits (Tr. 229).  The doctor referred the plaintiff to Low Country Orthopedics on September 8, 2008, for further evaluation and treatment (Tr. 220).

6

Physical therapist Susanna Crosson evaluated the plaintiff on September 10, 2008, noting that she was suffering from severe lower back pain exacerbated by maintaining any position for a prolonged period of time (Tr. 219). Therapist Crosson noted that the plaintiff was unable to perform any of the muscle tests due to the pain and was tender to palpation in several areas of her lumbosacral region.

Dr. Don Stovall, and orthopaedic specialist, examined the plaintiff on September 15, 2008, upon referral from Doctors Care (Tr. 214, 217). Dr. Stovall reviewed the history of the plaintiff's injury, noting she continued to suffer from moderate aching pain in the lower lumbar spine that radiated to the posterior lateral aspect of the left leg accompanied by weakness that occasionally caused the leg to give way (Tr. 214). He noted that the plaintiff rated her pain at eight out of ten on the pain scale. Exam revealed findings consistent with those at Doctors Care. Dr. Stovall scheduled the plaintiff for an epidural steroid injection and advised her to continue physical therapy and remain out of work (Tr. 217).

A Physical Therapy Progress Report dated September 28, 2008, indicates that the plaintiff attempted six sessions of physical therapy, but continued to rate her pain 8/10 on the pain scale, continued to feel very weak in the left lower extremity, and was unable to tolerate progression of therapy because of her pain (Tr. 218). The therapist noted that the plaintiff had decreased strength to both lower extremities, left worse than right.

Dr. Stovall saw the plaintiff for follow-up on October 16, 2008, noting that she continued to have lower back and left leg pain and had stumbled twice from the weakness to her left thigh (Tr. 261). His assessment included L3-4 disc bulge with sciatica. Dr. Stovall prescribed Flexeril and opined that it was necessary for the plaintiff to undergo an epidural steroid injection, which he reported had not been "approved" yet.

The plaintiff returned to Dr. Stovall on October 29, 2008, at which time he noted that she received an epidural steroid injection that provided relief for three days (Tr.

7

261).  Dr. Stovall also noted that the plaintiff's symptoms had returned and that she had fallen on one occasion.  Exam revealed some tenderness diffusely to the lower lumbar region and mild weakness to the left lower extremity when compared to the right (Tr. 260). Assessment this day included disc bulge at L3-4 and left lumbar radiculitis.  Dr. Stovall prescribed a cane for the plaintiff and planned for her to undergo a second epidural steroid injection (Tr. 260).  He advised her to remain out of work for three weeks.

Dr. Marc Dubick examined the plaintiff on November 3, 2008, for evaluation of low back pain and numbness to left calf and leg that caused her leg to "give way" (Tr. 206-208).  Dr. Dubick reported that an MRI performed on September 8, 2008, revealed:

• L3-L4 left paracentral intraforaminal protrusion with superimposed shallow extrusion;

• Contact and posterior deflexion and slight flattening of the exiting left L3; and,

• Crowding of the transiting left L4 nerve root.

(Tr. 206).  He noted that the plaintiff was experiencing numbness in her leg that extended down the anterior aspect of her thigh and into the lateral aspect of her calf stopping above her ankle and that she used a cane to aid in walking because she had fallen twice from the leg giving way.  She described the pain as aching, tender, tingling, throbbing, and numb and exacerbated by lying down, driving, sitting, walking, and standing.  Dr. Dubick indicated that neither physical therapy nor epidural steroid injection was helpful in relieving the plaintiff's pain.

Physical exam revealed that the plaintiff was 5'1" tall and 200 lbs (Tr. 207). Straight leg raising on the left in sitting position caused pain to the calf and low back with low back pain being twice as much as leg pain.  Straight leg raising on the right in the supine position caused pain, and gluteus medius testing revealed severe weakness on the left side with good strength on the right side (Tr. 207).  Dr. Dubick noted also that hip abduction exacerbated the plaintiff's low back pain and that bilateral knee to chest could

8

not be accomplished secondary to back pain.  He reported leg length discrepancy and that ASIS pressure in the sacrum revealed significant restriction bilaterally, left greater than right with tenderness at the lumbar facet region.  Yeoman test/hip extension also exacerbated the plaintiff's pain greater on the left, and psoas testing in the sitting position revealed significant weakness on the left side (Tr. 207).

Dr. Dubick's impression included:  1)  Status post work injury with left L3-L4 paracentral intraforaminal protrusion with superimposed shallow extrusion at L3-L4, 2) Concurrent severe structural dysfunction with sacroiliac joint dysfunction, left side greater than right, and probable lumbar facet dysfunction (Tr. 207).  His plan was for the plaintiff to continue epidural steroid injections and to undergo physical therapy structural evaluation with joint and soft tissue mobilization and stabilization exercises.  Dr. Dubick opined that the plaintiff may well have had a concurrent problem with both radicular symptomatology and a structural problem (Tr. 208).  He based this on his exam that revealed severe structural dysfunction.  Dr. Dubick reported that the plaintiff's left leg pain could be secondary to her L3-L4 herniation or could be a referred pain pattern from her sacroiliac joint and a lower lumbar facet dysfunction.  He stated that the plaintiff's leg "giving away" could be due to failure of the slip-crutch mechanism secondary to sacroiliac joint dysfunction or to radicular weakness secondary to disc herniation (Tr. 208).

A Rehabilitation Services Plan of Care report dated November 11, 2008, indicates that the plaintiff was suffering from the following functional impairments:

- Lower back pain that limited sitting, standing, and housework;
- Ms. King was sleeping in a recliner;
- Antalgic gait requiring cane;
- Sacroiliac dysfunction; and
- Tenderness to entire lumbar spine even to light touch.

9

(Tr. 254). The therapist set short and long term goals in hopes that the plaintiff would begin to recover and felt that her potential for goal achievement was good.

Dr. Stovall saw the plaintiff in follow-up on December 1 and 29, 2008, noting that she underwent her second epidural steroid injection, which provided relief for two days. After that, she continued to experience lower back pain and left leg weakness including to her thigh (Tr. 260). His diagnosis remained unchanged. He planned for the plaintiff to undergo another MRI (Tr. 259).

The plaintiff underwent two additional MRIs for herniated nucleus pulposus on January 8 and 21, 2009 (Tr. 234-235). The radiologist's impressions included: 1) L3/4 left paracentral to intraforaminal shallow extrusion with slight contact and posterior deflection exiting left L3 (Tr. 235), 2) Mild disc degeneration at L3-L4 with multifocal left-sided disc protrusion, 3) left paracentral protrusion producing posterior deflection of the left L4 nerve root, 4) Left foraminal protrusion producing flattening and posterior deflection of the exiting left L3 nerve root, and 5) Fibroid uterus (Tr. 234). An MRI dated September 16, 2009, again identified disc degeneration at L3-L4 with left sided disc protrusions producing deformity of the exiting L3 and descending L4 nerve roots (Tr 238).

Dr. Stovall saw the plaintiff again on January 26, 2009, noting that she had developed high blood pressure since her back injury, which she did not have prior to the injury (Tr. 259). Exam remained unchanged. Dr. Stovall's diagnoses included: 1) Left L3-4 disc bulge, 2) Left leg radiculitis, and 3) possible SI joint dysfunction (Tr. 258). He planned for the plaintiff to undergo one more epidural injection and opined to a reasonable degree of medical certainty that her elevated blood pressure was most likely due to her increased pain (Tr. 258).

On March 2, 2009, Dr. Stovall saw the plaintiff in follow-up, noting that the third epidural injection provided four to five days of pretty good relief, after which point all her symptoms returned (Tr. 258). Dr. Stovall noted that the plaintiff continued to require

10

use of a cane. He opined that she had gone six months without improvement with conservative measures and recommended surgical intervention (Tr. 257-58).

Dr. Stovall saw the plaintiff again on March 9, 2009, noting that she had opted out of surgical intervention at that time, which Dr. Stovall felt was reasonable (Tr. 257). He opined that if the plaintiff did not elect surgery, then she was at maximum medical improvement and released her to light duty work, which would include lifting no more than 25 pounds on an occasional basis and ten pounds on a frequent basis. (Tr. 256-57, 288).

The plaintiff tried to return to work in March 2009, seven months after the initial injury, but she required emergency room treatment after less than a week at work because of increased pain (Tr. 244, 256). Emergency room records dated March 17, 2009, indicate that the plaintiff presented for an exacerbation of her back pain (Tr. 242-245). The emergency room doctor noted that the plaintiff's back pain became worse after she tried to return to work. Exam revealed pain to palpation along the lumbar spine with positive straight leg raising (Tr. 243). Diagnoses included history of back injury and low back pain (Tr. 244). The doctor prescribed Prednisone and Percocet and advised the plaintiff to remain out of work for seven days (Tr. 244).

On March 19, 2009, Dr. Stovall noted that the plaintiff had attempted to return to work after which she experienced an increase in her back symptoms requiring emergency treatment (Tr. 256). Exam revealed diffuse tenderness, limited range of motion, and mildly positive straight leg raise on left. His diagnoses remained unchanged as did his recommendations. On April 3, 2009, Dr. Stovall issued an addendum indicating light duty for the plaintiff with lifting restrictions to no more than 25 pounds occasionally and ten pounds frequently, occasional climbing, bending, stooping, and overhead reaching.

L. Randolph Waid, Ph.D., conducted a psychological evaluation of the plaintiff on April 15, 2009, on referral by the plaintiff's attorney (Tr. 272-75). He administered the following tests to evaluate the plaintiff's psychological condition:   1)   The Minnesota

11

Multiphasic Personality Inventory - 2 (MMPI-2), 2) Beck Depression Inventory - II, and 3)
Multi- Dimensional Pain Inventory. Dr. Waid reported that the test results were valid (Tr.
273). The MMPI-2 clinical profile revealed that the plaintiff was compromised by chronic
pain and somatic symptoms with some comorbid depressive symptoms. Dr. Waid indicated
the Beck Depression scales revealed that the plaintiff was experiencing mild to moderate
depressive symptoms including sleep disturbances, reduced energy, increased irritability,
mild concentration difficulties, and reduced interest in sex. He reported the pain inventory
suggested that the plaintiff was not an individual who was exaggerating her pain for the
purpose of secondary gain. She described her pain as interfering with her daily activities
and causing a significant change in her ability to work. His diagnosis was mood disorder
with depressive features secondary to the interfering effects of a chronic pain syndrome (Tr.
275).

On April 27, 2009, the plaintiff was seen by Dr. James K Aymond with
Orthopaedic Specialists of Charleston for a second opinion evaluation. He opined that the
plaintiff was a candidate for lumbar discectomy as well as facetectomy as well as interbody
and posterolateral arthrodesis and L3-4 segmental instrumentation. He did not think that
a simple diskectomy or microsurgical diskectomy would help the plaintiff to any appreciable
degree. Dr. Aymond stated that if the plaintiff did not wish to proceed with surgical
intervention, he would agree with an impairment of 10% whole person and 13% regional
impairment of the lumbar spine (Tr. 317).

On April 29, 2009, Jean R. Hutchinson, M.Ed., a certified rehabilitation
counselor, issued a report evaluating the plaintiff's employability. Ms. Hutchinson opined
that the plaintiff could not perform her former work as a teacher's assistant. She further
opined that the plaintiff did not have transferable skills to perform work within her residual
functional capacity ("RFC"). Ms. Hutchinson stated that it was her opinion that the plaintiff

12

was not able to engage in an eight-hour work day in a substantial number of jobs and could not perform work tasks on a sustained basis (Tr. 320-25).

Dr. Stovall saw the plaintiff in follow-up on June 15, 2009, noting that she continued with progressive pain to her left lower extremity, lower back, and left thigh down to her knee that continued to cause her leg to give way at times (Tr. 287). Exam revealed mild tenderness and limited flexibility of the thoracolumbar spine, mildly positive straight leg raise on the left, fairly good range of motion of the left knee, decreased sensation over the anterior aspect of the left thigh with some quadriceps weakness upon extension compared to the right. Dr. Stovall's assessment included L3-4 disc bulge and left lumbar radiculitis with some progression of neurologic deficit in the left lower extremity, for which he recommended surgical intervention (Tr. 287).

In September 2009, the plaintiff developed new symptoms of neurogenic bladder, which Dr. Stovall stated was "likely related to the herniated disc at L3-4" (Tr. 285-86). Dr. Stovall recommended an updated MRI, which was performed that month. The MRI showed moderate disc degeneration and dessication at the L3-4 level. There was a left paracentral and foraminal protrusion and some effect on the left L3 nerve root and the descending L4 nerve root. The rest of the levels showed no evidence of herniated disc, spinal canal stenosis, or nerve root impingement. Dr. Stovall noted that because of further degeneration in the L3-4 disc and further radicular symptoms and the fact that it had been a year since her surgery, she would require an L3-4 fusion if surgery was performed (Tr. 285). The plaintiff was unable to obtain Workers' Compensation approval for surgery (Tr. 284-85). Dr. Stovall also recommended that the plaintiff follow up for evaluation of her blood pressure, which was borderline high (Tr. 284).

At the hearing, the plaintiff testified that she tried to work in March 2009, but was unable to do so (Tr. 27- 28). She stated that she lives in constant pain for which her only short-lived remedies are medication and inactivity (Tr. 28-34). The plaintiff testified that

13

she takes Tramadol four times a day for pain and that without medication she could "do pretty much nothing," but she could do "do pretty much nothing with it, because it keeps [her] drowsy" (Tr. 30-31).  She claimed that her left leg just "gives out" on her without warning (Tr. 31).  The plaintiff testified that she had nerve blocks, pain management, and physical therapy.  The plaintiff refused surgery when it was first offered.  When she had a second opinion, the doctor recommended a fusion, but Workers' Compensation refused to pay for it (Tr. 32).  She claimed she could only sit for 30 minutes at a time and stand for up to 20 minutes (Tr. 33).  She testified that she could only walk for 20 minutes at a time and that her daughter did most of the household chores. (Tr. 33, 35).

## ANALYSIS

The plaintiff alleges disability commencing  August 28, 2008, at which time she was 43 years old.  She was 46 years old on the date of the ALJ's decision.  She previously worked as certified nursing assistant and a teacher's aide.  The ALJ found that the plaintiff could perform a limited range of light work.  The plaintiff argues that the ALJ erred by failing to properly evaluate her credibility.

The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process.  First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold

14

obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:
>
> > While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id.* at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider

in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

16

*Id.* at *3.  *See* 20 C.F.R. § 404.1529(c).

In assessing the plaintiff's credibility, the ALJ found that while the plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms were not fully credible (Tr. 15).   The ALJ noted the following in evaluating the plaintiff's credibility (Tr. 15-17): although the plaintiff complained of disabling side effects from her pain medication at her hearing, she made no such complaint to her doctors (*see, e.g.* Tr. 257, 261); she once complained to her doctor of bladder problems, but made no such allegation at the hearing (Tr. 286); she did not seek medical treatment after January 2010, despite a recommendation she receive follow-up care for her high blood pressure (Tr. 284); she had not been seen by a pain specialist; she had no evidence of instability and had normal muscle tone in September 2008 (Tr. 262); she had some relief from her symptoms after epidural injections (Tr. 258, 261); she was released to light duty work by her treating physician (Tr. 256, 288); she was able to perform daily activities, including driving a car, performing household chores, and shopping (Tr. 180); the medical evidence did not support the significant functional limitations alleged by the plaintiff (Tr. 256-71, 284-93, 316-18);   and two physicians opined that the plaintiff would have 10% impairment of the whole person and 13% impairment of the lumbar spine (Tr. 257, 317).

The plaintiff argues that the ALJ's finding that her symptoms were not fully credible to the extent they were inconsistent with her RFC (Tr. 15) "turned the entire credibility analysis on its head by incorrectly using [the] previously determined RFC finding as the measure by which to conclude that [her] statements regarding the intensity, persistence, and limiting effects of her pain were not fully credible" (pl. brief 8).  As argued by the Commissioner, however, the ALJ's decision reflects that she undertook a thorough analysis of the plaintiff's complaints and the record in general in accordance with the above cited law.  Accordingly, the undersigned sees no error in the ALJ's narrative style.

17

The plaintiff next argues that the ALJ improperly relied on the absence of objective evidence in finding her not entirely credible (pl. brief 6, 10, 21). As set forth above, the decision reflects that the ALJ analyzed the plaintiff's credibility by citing her reported activities and failure to pursue treatment, normal findings and response to treatment, and her physicians' opinions that she was only partially impaired and could return to light work (Tr. 15-17). Here, the absence of objective evidence was only one of the factors properly considered by the ALJ. *See* 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); *id.* § 1529(c)(4) (noting that the ALJ must consider whether there are conflicts between a claimant's statements and the signs and laboratory findings).

The plaintiff further argues that the ALJ's observation that she did not seek additional treatment after 2010 was in error because she could not afford further treatment (pl. brief 9-10). The ALJ specifically stated as follows: "There is no evidence in the record that the claimant sought any medical treatment after January 2010, even though Dr. Stovall suggested the claimant seek treatment at Doctors Care for further monitoring of her high blood pressure" (Tr. 15). However, the ALJ also recounted the plaintiff's treatment for back pain and specifically acknowledged Dr. Stovall's treatment notes showing conservative treatment had appeared to be unsuccessful, surgery might be necessary, and that otherwise the plaintiff had reached maximum medical improvement (Tr. 16, 257). Further, as the ALJ also noted, the plaintiff's doctor considered her original decision not to pursue surgery to be reasonable, and he released her to light duty work (Tr. 16-17, 257). The ALJ further acknowledged that when the plaintiff considered surgery for the second time, her

18

Workers' Compensation plan would not agree to pay for it (Tr. 18, 31, 284). Based upon the foregoing, it does not appear that the ALJ drew a negative inference from the plaintiff's failure to have surgery. Although the plaintiff was not approved for surgery, she also elected to stop pursuing treatment for her blood pressure, a fact she does not contest, which was not connected to her Workers' Compensation benefits (Tr. 284). Accordingly, the undersigned finds no error in this regard.

The plaintiff further argues that the ALJ improperly noted that she did not complain of bladder symptoms at the hearing, claiming she did make such a complaint at the hearing (pl. brief 9). However, in making this argument, the plaintiff relies on her counsel's statement at the hearing that the plaintiff once complained to her doctor of bladder problems, a treatment note that the ALJ considered in the decision (pl. brief 9; *see* Tr. 17-18). However, at the hearing, the plaintiff herself did not complain of bladder problems when the ALJ asked her to describe the symptoms that prevented her from working and upon questioning by her counsel (Tr. 30-33, 35-37). Accordingly, the undersigned finds no error in this regard.

The plaintiff further claims that, contrary to the ALJ's finding, she did complain of side effects from medications (pl. brief 10). She cites two occasions on which she complained of side effects (*id.* (citing Tr. 176, 225)). One of the documents is her application for disability (Tr. 176). The other document cited by the plaintiff is a treatment note from Doctors Care dated September 4, 2008 (Tr. 225). While this treatment note is hard to read, the plaintiff's recitation of the medical evidence states that the physician noted that she was unable to tolerate Lortab (pl. brief 11-12 (citing Tr. 225)). The plaintiff had previously been prescribed Lortab a few days earlier on August 31, 2008, which was just after her initial back injury (Tr. 230). There is no indication that the plaintiff was prescribed Lortab again. Otherwise, the ALJ accurately noted that she made no mention of side effects from her medication. Accordingly, the undersigned finds no error in this regard.

19

As part of her credibility argument, the plaintiff contends that the ALJ improperly rejected the opinion of Jean Hutchinson, M.Ed, because the opinion relied on the plaintiff's subjective complaints of pain (pl. brief 21-23). The ALJ gave Ms. Hutchinson's opinion no weight. In doing so, the ALJ noted that Ms. Hutchinson is a vocational rehabilitation counselor and therefore not an "acceptable medical source" under the Commissioner's regulations (Tr. 18-19). *See* 20 C.F.R. § 404.1513(a) (defining "acceptable medical sources"). However, the ALJ further noted that Ms. Hutchinson could be considered as an "other source" whose information might help show the severity of a claimant's impairments (Tr. 19). *Id.* § 404.1513(d). *See* SSR 06-03p, 2006 WL 2329939, at *4 (stating that the weight to be given to evidence from other sources "will vary according to the particular facts of the case, the source of the opinion, including that source's qualifications, the issue(s) that the opinion is about, and many other factors"); *Craig v. Chater*, 76 F.3d 585, 586 (4th Cir. 1996) (ALJ did not err in failing to expressly consider the report of physical therapist, an "other source"). "[O]nly 'acceptable medical sources' can be considered treating sources, . . . whose medical opinions may be entitled to controlling weight." 2006 WL 2329939, at *2. The ALJ "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6.

Here, the ALJ specifically considered Ms. Hutchinson's opinion that the plaintiff's impairments prevented her from making an adjustment to any work that exists in significant numbers in the national economy (Tr. 18-19; *see* Tr. 320-25). The ALJ noted that Ms. Hutchinson referred to Dr. Stovall's opinion, which limited the plaintiff to light duty. The ALJ noted that while Dr. Stovall's restrictions precluded the plaintiff from performing her past relevant work, the limitations had been taken into consideration in determining the

20

plaintiff's RFC (Tr. 19).  The ALJ further noted that on April 3, 2009, just a month before Ms. Hutchinson issued her report, Dr. Stovall defined the plaintiff's restriction to light work as lifting no more than 25 pounds on an occasional basis and ten pounds on a frequent basis. It would also include occasional climbing, bending, stooping, and reaching overhead (Tr. 19; *see* Tr. 256).  The ALJ noted that Ms. Hutchinson may not have been aware of Dr. Stovall's April 3rd note since she used only part of his opinion to justify her own.  The ALJ found that the restrictions found by Ms. Hutchinson were inconsistent with the medical evidence of record and were based on the plaintiff's subjective complaints, which the ALJ found were not entirely credible.  Accordingly, the opinion was given no weight (Tr. 19). The undersigned finds that the ALJ appropriately considered Ms. Hutchinson's opinion as an "other source," and substantial evidence supports the decision to give the opinion no weight.

Substantial evidence also supports the ALJ's determination of the plaintiff's RFC limiting her to light work with the additional limitations of avoiding running, jumping, climbing, and walking on uneven surfaces, but otherwise performing postural activities occasionally; occasional reaching overhead; avoiding all exposure to dangerous moving machinery and unprotected heights; and limited to the performance of simple, routine, repetitive tasks.  The ALJ specifically gave significant weight to the opinion of treating physician Dr. Stovall.  The ALJ also gave significant weight to the opinion of examining physician Dr. Aymond, who found that the plaintiff had a 10% impairment of the whole person and a 13% impairment of the lumbar spine (Tr. 18).  The ALJ also gave significant weight to the opinion of Michael Neboschick, Ph.D, a State agency psychological consultant, who determined that the plaintiff's mental impairment was non-severe (Tr. 19; *see* Tr. 302-15).  The opinion of Dr. Waid, who performed a psychological evaluation of the plaintiff, was given weight "insomuch as it supports a finding that the claimant's mental

impairments are secondary to her pain and not a result of psychological difficulties" (Tr. 19; *see* Tr. 272-75).

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

January 9, 2014
Grenville, South Carolina

22